# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| PAUL ANTHONY STANTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:11-CV-30-TLS |
| | ) | |
| FORT WAYNE-ALLEN COUNTY, AIRPORT | ) | |
| AUTHORITY, MEMBERS OF THE BOARD | ) | |
| OF DIRECTORS OF THE FORT WAYNE-ALLEN | ) | |
| COUNTY AIRPORT AUTHORITY, in their | ) | |
| official capacities, and EXECUTIVE DIRECTOR | ) | |
| OF THE FORT WAYNE-ALLEN COUNTY | ) | |
| AIRPORT AUTHORITY, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION & ORDER

Plaintiff Paul Anthony Stanton brings this action against Defendants Fort Wayne-Allen County Airport Authority and its board members and executive director in their official capacities (the Airport Authority), contending that the Airport Authority's restrictions on First Amendment activities at the Fort Wayne International Airport (FWA or the Airport) violate his free speech rights under the First Amendment. The Plaintiff's lawsuit challenges the constitutionality of Airport Authority Resolution No. 11-06, titled "Rules Regulating Time, Place and Manner of Expressive Activities, Literature Distribution and Solicitation at Fort Wayne International Airport." (Def.'s Notice of Passage of Resolution No. 11-06, Ex. A, ECF No. 29-1.) Both parties agree that summary judgment is the appropriate resolution of this case because there are no contested issues of material fact. The Defendants filed their Motion for Summary Judgment and Designation of Evidence [ECF No. 46] on September 2, 2011, which was deemed filed *nunc pro tunc* to July 13, 2011. On July 15, the Plaintiff filed his Motion for Summary Judgment [ECF No. 38]. The parties

have completed briefing and the matter is ripe for this Court to rule. For the reasons stated in this

Opinion, the Court grants summary judgment in favor of the Airport Authority.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). The motion should be granted so long as no

rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the

evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to

determine whether there is a genuine issue of triable fact. *Id.* at 249–50; *Doe v. R.R. Donnelley &

Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). With cross-motions, the court must construe all

inference in favor of the party against whom the motion under consideration is made. *Mote v.

Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007). A material fact must be outcome

determinative under the governing law. *Insola v. Philip Morris, Inc.*, 216 F.3d 596, 598–99 (7th

Cir. 2000). "Irrelevant or unnecessary facts do not deter summary judgment, even when in

dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

## STATEMENT OF FACTS

### A.      The Airport Authority and FWA

The Airport Authority, which is a creation of the City of Fort Wayne and Allen County,

owns and operates FWA, which is located on the south side of Fort Wayne. The Airport Authority

has a Board of Directors, comprised of six board members, which is responsible for adopting policies governing activity at the Airport. An Executive Director oversees the day-to-day operations of the Airport. FWA offers commercial passenger, commercial cargo, military, and general aviation operations. FWA has four commercial passenger airlines at its terminal. The first commercial passenger flight departs at 6:00 AM and the last scheduled flight arrives around 10:50 PM. FWA services about 40,000 departing and arriving commercial airline passengers each month.

The Airport Authority considers the FWA terminal to have two distinct areas for security purposes, referred to as the Land Side and the Air Side. Access to the Air Side is generally limited to airport, airline, Transportation Safety Administration (TSA), and airport tenant employees and to ticketed passengers who have cleared TSA security. To clear security, a ticketed passenger walks from the ticket counter down a short, narrow hallway to the TSA security check point. One of the entrances to the terminal building is located eight feet from the TSA security line. A traveler arriving at the Airport passes out of the Air Side near this same TSA security check point. As they pass out of this area, travelers may be greeted by a volunteer from FWA's Welcome Center, called a "Hospitality Host," who hands out free cookies while welcoming travelers to Fort Wayne. The arriving traveler can then exit a door straight ahead or turn right and walk a short distance to the baggage claim area, which also includes a car rental dealer. The entire terminal is an obtuse "L" shape with ticketing on one end, baggage claim on the other end, and the security check point in the middle.

On the Air Side of the terminal, travelers can access a restaurant, vending machines, a child play area, the Fort Wayne Air Museum, and a business center with computers for travelers' use. On the Land Side, FWA provides the following amenities for travelers or those waiting to greet

3

arriving passengers: restaurant/coffee shop; gift shop/bookstore; arcade-type video games; DeBrand's chocolate shop; child's play area; car rental dealership; automatic teller machine; and vending machines. Also included in this area are glass displays of artwork or other memorabilia, an electronic kiosk devoted to Fort Wayne sports history, the Welcome Center desk, and seating. The Airport also has a small meeting space available for rent. The Airport Authority rents out advertising space on various walls inside the terminal, both the Air and Land Side. An ordinance is in place to govern commercial expressive activity at the Airport.

There is no evidence suggesting that the general public frequents FWA to use any of these amenities, such as the restaurant or gift shop. FWA is not located near other commercially developed areas of the City and anyone parking at the Airport is required to pay parking fees. For several years after September 11, 2001, police were stationed in the roadway entrance to the terminal to check vehicles, and they limited access to the Airport to those persons who had legitimate airport business. Both sides of the terminal continue to be under surveillance of TSA and FWA security and are subject to security-related regulations. If airline or FWA employees were to see someone at the Airport who did not appear to have any airport-related activity to conduct, they would likely call security. Any member of the public who wished to view the items in the Air Museum but was not going to be traveling would be required to go through a vetting process. The designated evidence does not indicate whether anyone who was not otherwise using the Airport for air travel has ever requested to visit the Museum, or what the vetting process would involve.

**B.      Resolution No. 10-06 and Resolution No. 11-06**

On November 9, 2010, members of the United Steel Workers Union began handing out

4

pamphlets to airline employees on FWA's premises. The Union's activities also included attempting to pass pamphlets to the Air Side of the terminal by pushing them through the luggage openings in the baggage claim area, which is a violation of TSA security regulations. Security responded and asked the violators to leave. Following this incident and others, the Authority, acting through its Board, enacted Resolution No. 10-06, "Rules Regulating Time, Place and Manner of Expressive Activities, Literature Distribution and Solicitation at Fort Wayne International Airport."

On November 23, 2010, the Plaintiff contacted the Airport Authority requesting that he be allowed to distribute political flyers at the terminal. The Plaintiff was provided a copy of Resolution No. 10-06, which required that he obtain a permit from the Airport Authority before engaging in protected speech, and required that any such activity be limited to a designated free speech zone. The Plaintiff did not follow up with the Airport Authority but, on January 20, 2011, filed a Complaint For Declaratory and Injunctive Relief in this Court. On January 26, the Plaintiff filed a Motion for Preliminary Injunction requesting that the Court enjoin enforcement of Resolution No. 10-06. The Court set an evidentiary hearing date of March 29, 2011, for the Motion for Preliminary Injunction, but later vacated the hearing upon the Plaintiff's oral motion to withdraw the Motion for Preliminary Injunction because the Authority repealed Resolution No. 10-06 and passed a new resolution.

On March 21, 2011, the Authority passed Resolution No. 11-06, which declares that it is intended to regulate the time, place, and manner in which individuals and groups can exercise their constitutional rights to free speech at FWA "so as to ensure that the security, operational efficiency and aesthetics of the Airport's terminal will not be impaired directly or indirectly by the use of the

5

terminal for such free speech purposes." (Res. No. 11-06, Preamble, ECF No. 29-1.)  Pursuant to

Resolution No. 11-06, "Expressive Activity" is defined as "any protest, proselytization,

propagandizement, or other communication or conveyance of an idea or ideas, or message or

messages." (*Id.*, Section Two, Definitions.) "Literature Distribution" is defined as "the handing out

or other dissemination of documents or other material containing or setting forth language or some

other form of written or printed matter, symbols or images." (*Id.*)[1] According to Resolution No. 11-

06, Expressive Activity and Literature Distribution does not include or refer to the following:

> communication, conveyance, document distribution or solicitation of an idea or ideas,
> or message or messages, that is incidental to the use of the Airport's facilities, such as
> conversation, discussion or other form of contact, literature distribution or solicitation
> among and between travelers, persons employed at the Airport, and other persons
> whose primary purpose for being present at the Airport is a purpose other than
> exercising free speech rights; symbolic attire such as political campaign buttons or T-
> shirts emblazoned with logos, phrases or statements by persons whose primary purpose
> for being present at the Airport is a purpose other than exercising free speech rights.

(*Id.*)

Resolution No. 11-06 designates four "Free Speech Areas" at the Airport. Two of these

areas are located on the sidewalk outside entrances that lead to the airline ticket counters. The

remaining two free speech areas are located inside the terminal building on either end of the

terminal—near the ticket counters on one end and near the baggage claim conveyors on the other

end. According to Resolution No. 11-06, a person or group may only engage in Expressive

Activity or Literature Distribution if they have obtained a permit from the Authority's Director in

accordance with the permit process set forth in the Resolution. The permit application requires that

the applicant provide the full name, mailing address, and telephone number of the person or

---

[1] The Resolution also provides a definition of "Solicitation," but it is not material to this case and the resolution of the parties' cross motions for summary judgment.

organization sponsoring, promoting, or conducting the proposed activity. The applicant must also provide the subject matter of the proposed message or idea—but not the viewpoint that will be expressed; the target audience; the number of persons who will be engaged in the activity; the location at the Airport where the activity is to occur; and the dates and hours being requested. Applicants must submit their applications to the Director at least two days before they intend to engage in the proposed activity. The Director is not given discretion to deny a permit based upon the identity of the person, group, or organization desiring to engage in Expressive Activity or Literature Distribution, or upon the topic or content of the proposed activity. However, after a permit has been issued, the Director has discretion to restrict or suspend activities authorized by the permit in the event of certain emergency conditions that disrupt the normal operations of the Airport. Also, at the request of an applicant, the Director may designate additional free speech areas or shorten the two-day permit application deadline, provided that the proposed free speech activity would not interfere with the safe and orderly operation of the Airport and is consistent with the purposes of the Resolution.

## C.      The Plaintiff's Free Speech Activity

The Plaintiff believes that the heightened security and screening procedures that TSA has implemented, which include full-body scanners or enhanced pat-downs for all persons engaged in air travel in the United States, violate the United States Constitution. To express his opposition to these procedures, he would like to hand out copies of the United States Constitution and other related materials to travelers and others who pass by him at the Airport. The Plaintiff wishes to engage in this activity with others who oppose these procedures. He believes that two to three

people would likely form the group and that it is unlikely that more than six people would engage

in such activity simultaneously. The Plaintiff does not want to apply for a permit in advance of

engaging in free speech activity. He contends that "because of his schedule and the schedules of

[his] colleagues, [he] will often not even be aware two (2) calendar days prior to the proposed

expressive activity of the time and date in which [he] would like to engage in protected activity.

(Stanton Supp'l Aff. ¶ 4, ECF No. 38-1.) Additionally, he does not want to disclose his identity, the

subject matter of his activity, or the targeted audience because his activity concerns the

constitutionality of procedures used at the Airport.

      On Saturday, July 2, 2011, the Plaintiff submitted a request to conduct free speech activity

at FWA from 7:00 AM to 3:00 PM on Monday, July 4.  The Special Events Request Form that the

Plaintiff completed offered four location choices: Outside Departures Area; Inside Arrivals Area;

Inside Departures Area; and Other (please specify). (Williams Aff. Ex. A, ECF No. 40-1.) The

Plaintiff selected the Outside Departures Area. Although the Airport Authority offices were closed

for the holiday weekend, the Authority granted the request. On July 4, Craig Williams, Director of

Administration and Finance, met the Plaintiff when he arrived at the Airport. Another man was

accompanying the Plaintiff. Because there were two designated free speech areas outside the

departures area, Williams asked the Plaintiff which one he would like, and the Plaintiff chose a

location. Williams identified the boundaries, told the Plaintiff, in response to his inquiry, that he

was permitted to go into the terminal to use the restroom and get food at the restaurant as long as

he did not perform his activity outside the approved area. Williams also told the Plaintiff to expect

Customer Service Agents, Public Safety Officers, and TSA Officers walking or driving through the

area as part of normal Airport operations unrelated to the Plaintiff's activities. The Plaintiff and his

colleague handed out copies of the United States Constitution from 8:00 AM to 11:00 AM. They assert that numerous persons passed through the Airport during this time without approaching them or coming within their general vicinity so that they could talk to them or hand them a copy of the Constitution. In addition, some people who wanted a copy of the Constitution were not willing to walk to them to get it, and the Plaintiff did not believe he could leave the area to hand it to them. The Plaintiff and his colleague also wanted to read portions of the Constitution out loud in a normal tone of voice, perhaps while standing on top of a classic soapbox. However, because they had not obtained a permit to engage in this activity, they refrained from doing so. Neither did they call Williams, whose cellular phone number they had been provided, with an invitation to call if they had any problems or questions.

## ANALYSIS

The Supreme Court has held that the constitutionality of a government restriction on free speech activity depends, first, on the nature of the forum in which the restriction is applied and, then, on the type of restriction. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44–46 (1983); *see also Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 800 (1985) (explaining that "the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes"). The Court has articulated three distinct categories of government "fora" for purposes of free speech activities: (1) traditional public fora; (2) designated public fora; and (3) nonpublic fora. *Perry*, 460 U.S. at 44–46; *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79 (1992). The parties agree that FWA is a

nonpublic forum. *See Lee*, 505 U.S. at 678–79, 686 (O'Connor, J., concurring). Because of this designation, the government has greater latitude to impose time, place, and manner restrictions on speech: any restriction on expressive activity must be "viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 189 (2007); *see also Cornelius*, 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."). "The Government, 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" *United States v. Grace*, 461 U.S. 171, 178 (1983) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)).

Although the Plaintiff agrees that the Airport is a nonpublic forum (Pl.'s Mem. Law Supp. Mot. Summ. J. 16, ECF No. 39 (recognizing that determining the appropriate test through which a restriction on expression is analyzed begins with ascertaining the forum, and that airports like FWA constitute "non-public fora" for First Amendment purposes), he also argues that the Airport Authority has created designated public forums within the free speech areas, and that the analysis is more rigorous with respect to these areas (*Id.* at 20.) This argument is not persuasive. By limiting expressive activity to certain areas and requiring speakers to obtain a permit, the Airport Authority has not "intentionally open[ed] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802 (inaction or permission of limited discourse is not sufficient to create a public forum); *Ark Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 667 (1998). To determine whether the government has created such a designated forum, a court must look to "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to

10

assembly and debate as a public forum . . . [and] examine[ ] the nature of the property and its compatibility with expressive activity to discern the government's intent." *Cornelius*, 473 U.S. at 802. The designation of certain free speech zones, along with the permit requirement and limitation of expression to certain times, manners, and places as set forth in the permit, are marks of the Airport Authority's attempt to *restrict* public discourse, and are inconsistent with an intent to designate a public forum. *See Perry*, 460 U.S. at 47 (reasoning that a school mail system was not a designated public forum where the practice was to require permission from individual school principals before granting access to the system to communicate with teachers); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302–03 (1974) (finding no public forum for city transit bus advertising space where the city's management contract required the managing company to exercise control over the subject matter of the displays); *Hawkins v. City and Cnty. of Denver*, 170 F.3d 1281, 1288 (10th Cir. 1999) (finding no designated public forum where the government did not have a policy or practice throwing open a facility for public expressive activity and its written speech policy clearly stated that demonstrations and leafletting were not permitted without the express consent of the facility manager). Moreover, the nature of the property is consistent with an intent to limit public discourse. FWA, as a commercial enterprise attempting to provide services attractive to customers who desire quick, efficient, and safe access to air travel, is not compatible with use by the public at large for assembly and speech. Thus, the Court will not apply a different standard to the free speech areas created by the Resolution, but will consider the entire FWA facility to be a nonpublic forum.

The Plaintiff also thinks it significant that the Airport Authority restricts free speech activity on the sidewalks outside the terminal, thereby restricting speech in what is traditionally a

11

public fora. The Court finds that the sidewalks adjacent to the FWA terminal, which are under the control of the Authority and subject to TSA regulations, are nonpublic fora. They are intended by the Authority to be used for air travel related purposes, "not to facilitate the daily commerce and life of the neighborhood or city." *United States v. Kokinda*, 497 U.S. 720, 728–29 (1990) (recognizing that the location and purpose of a publicly owned sidewalk is critical to determining whether it constitutes a public forum); *ISKCON Miami, Inc. v. Metro. Dade Cnty.*, 147 F.3d 1282, 1289 (11th Cir. 1998) (finding that sidewalks and a parking lot adjacent to Miami airport terminals were nonpublic fora).

FWA is a nonpublic forum—even in the free speech areas and the sidewalks adjacent to the terminal—and  the Court will analyze the constitutionality of Resolution No. 11-06 accordingly.

### A.      Reasonableness of Designated Free Speech Areas

It is "black-letter law that, when the government permits speech on government property that is a nonpublic forum, it can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport*, 551 U.S. at 189. The Plaintiff does not dispute that the Resolution is viewpoint neutral. His argument is that Resolution No. 11-06 is not reasonable.

One argument the Plaintiff advances is that restricting expressive activity to "small out-of-the-way locations" is "wholly inadequate to permit [him] to exercise his free-speech rights, and his attempt to utilize this forum in order to do so resulted in a substantial burden on his ability to get his message across." (Pl.'s Mem. Law Supp. Mot. Summ. J. 18.) Although the Plaintiff may be correct that there are more effective areas to communicate his ideas than those that are designated

in Resolution No. 11-06, a nonpublic forum does not need to provide unrestricted access based on a speaker's unhappiness with the government-chosen location. The decision to restrict access to FWA "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (original emphasis). "In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Id.* "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id.* at 809; *cf. Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (recognizing that the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired"); *see also ISKCON Miami*, 147 F.3d at 1290–91 (upholding a restriction on distribution of literature to eight designated areas within the Miami International Airport (MIA) terminal that were "away from ticket lines, metal detectors, and exits and entrances, but adjacent to the flow of passenger traffic"). In *ISKCON Miami*, the plaintiffs submitted expert testimony that the designated zones were not the best zones for the promotion of expressive activities. The court agreed with the Defendant's assertion that, absent more concrete evidence showing that the areas for speech activities at the airport were insufficient, questions concerning the allocation of space for speech activities in the airport were for the Director of MIA. *Id.* at 1290. Likewise, the Plaintiff's assertion that he was not able to talk to many travelers because they did not approach him or come within his general vicinity is unhelpful without more concrete evidence. Although the Plaintiff has established that the designated zones are not the best zones, he has not presented evidence that they were insufficient or unreasonable.

Having determined that the Plaintiff's dissatisfaction with the free speech areas is not dispositive to a determination about their reasonableness, the Court turns to the purpose of the FWA, for it is the purpose of the forum that informs whether the restrictions are reasonable. The Airport Authority contends that the purpose of FWA is to provide and facilitate passenger air travel. The Plaintiff argues that "there are numerous amenities —*purposes*— entirely unrelated to air travel that are available and offered at the Airport . . . rang[ing] from a restaurant and video game arcade, to a museum and educational kiosks, to free wireless internet and a 'hospitality host' program for free cookies, to numerous art displays and advertisements." (Pl.'s Resp. in Opp'n 8, ECF No. 41.) Thus, the Plaintiff argues, the Defendant incorrectly characterizes FWA as a single-purpose facility. As *Lee* counsels, an airport can have more than one purpose. In addition, to the extent that the inclusion of certain amenities expands FWA's purposes beyond the facilitation of air travel, these purposes will frame the reasonableness inquiry. *See Lee*, 505 U.S. at 689 (O'Connor, J., concurring) (rejecting the Port Authority's claim that it was dedicated to the single purpose of facilitating air travel and finding that "[t]he reasonableness inquiry, therefore, is not whether the restrictions on speech are 'consistent with . . . preserving the property' for air travel, but whether they are reasonably related to maintaining the multipurpose environment that the Port Authority has deliberately created." (citations omitted)); *see also Cornelius*, 473 U.S. at 809 ("The reasonableness of the Government's restriction [on speech in] a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances.").

That said, the Court finds the purposes of FWA less broad and varied than the Plaintiff asserts. The Court holds that, as a commercial enterprise that provides air travel, the primary purpose of FWA is to facilitate such travel. The Plaintiff's argument correlates every amenity with

14

a purpose that is "entirely unrelated to air travel."  The Court finds that the amenities FWA
provides to travelers and those who may accompany or greet them are not so unrelated. To the
contrary, most are consistent with the purpose of the Airport to facilitate air travel and to
accommodate customers while they wait for flights. *See Lee*, 505 U.S. at 682 (recognizing that an
airport must "provide services attractive to the marketplace"); *cf. Marcavage v. City of Chi.*, 659
F.3d 626, 633 (7th Cir. 2011) (stating that Navy Pier's "designation as a nonpublic forum
appropriately reflects its commercial nature" and that "[t]hough it is a recreational area open to the
public, . . . [i]ts nature is one of private enterprise with tangential public benefit"). The amenities
FWA offers are intended to make air travel at the Airport more convenient and pleasurable. Unlike
the Port Authority at issue in *Lee*, FWA has not "created a huge complex open to travelers and
nontravelers alike." 505 U.S. at 688 (O'Connor, J., concurring) (noting that one of the airport's
arrival buildings even had two branches of Bloomingdale's); *id.* at 688–89 (holding that the Port
Authority was not only operating an airport, but also a "shopping mall" because it promoted a
"wide range of activities . . . no more directly related to facilitating air travel than are the types of
activities in which the [plaintiff religious group] wishes to engage"). In comparison, FWA has not
added any features and attractions to its facility that would make it a destination for those who do
not otherwise have a reason to be at the Airport for its primary and dedicated purpose. Instead,
most of the amenities existing at FWA can only be seen as complementing its primary purpose of
serving air passengers. For example, the Airport, which must compete with other commercial
entities offering the same services, chooses to use Hospitality Hosts to welcome arriving
passengers to Fort Wayne.  FWA markets itself as "the nation's friendliest airport" based upon a
USA TODAY column, and touts that "Hospitality Hosts welcome you back to Fort Wayne with a

15

fresh-baked cookie when you return from your trip." http://flyfwa.com; Harriet Baskas, special for

USA Today, *Free at the airport; Cookies, popcorn - and toothbrushes*, posted 1/13/2010,

http://www.usatoday.com/travel /columnist/baskas/2010-01-13-unusual-airport-freebies_N.htm.

The offer of a fresh-baked cookie from a Hospitality Host is one of the perks listed by the Airport

in support of its claim to potential travelers that "Airport visitors will notice that a trip to FWA is a

bit different than a trip to most airports. We want you to feel welcome at our airport so we've gone

the extra mile to make your time at FWA as pleasant as possible." http://flyfwa.com/amenities-at-

fwa-aspx. There is no evidence to suggest that a person would visit the Airport for the sole purpose

of obtaining a free cookie. Likewise, play areas for waiting children, an ATM for travelers needing

cash, a restaurant and coffee shop for meals and snacks, and a business center are not independent

of the Airport's primary purpose, but instead fit within the purpose intended by the Airport. The

Museum, gift shop, and chocolate shop, although not directly related to air travel, are not so

predominant within the context of the Airport so as to significantly alter the purpose. The primary

purpose of FWA is to facilitate commercial air travel.

  With the primary purpose of the Airport in mind, the Court turns to the stated intent of the

time, place, and manner restrictions. The Preamble to Resolution No. 11-06 states that it is

intended to regulate the time, place, and manner of free speech activities "so as to ensure that the

security, operational efficiency and aesthetics of the Airport's terminal will not be impaired

directly or indirectly by the use of the terminal" for free speech purposes. (Resolution No. 11-06,

Preamble, ECF No. 29-1.) Section One of the Resolution is titled "Purpose" and includes the

following purposes, among others: to ensure adequate nearby police presence for protection of

persons exercising free speech rights; to protect persons using the Airport's terminal from

harassment, intimidation, and unlawful conduct on the part of persons exercising free speech; to

ensure the free and orderly flow of pedestrian traffic through the Airport's terminal premises and to

reduce congestion; and, to preserve and safeguard desirable aesthetic qualities and features of the

Airport terminal. In light of the special attributes of a commercial airport terminal, these are

legitimate governmental interests that the Defendants may promote through reasonable means,

including time, place, and manner restrictions.

 In connection with its purpose and stated interests, the Airport Authority has decided to

limit Expressive Activity and Literature Distribution to certain areas inside and outside the terminal

building. The two free speech areas located on the sidewalk directly outside the ticket counter are

immediately adjacent to where travelers enter the terminal building. A third zone is located near

the ticket counters inside the terminal building, albeit against the far wall in an area most customers

are not required to pass to approach a ticket counter. The fourth is on the other end of the terminal

in the baggage claim area.  Moreover, upon request by the permit applicant, the Director may

designate additional free speech areas provided that the proposed free speech activity would not

interfere with the safe and orderly operation of the Airport and is consistent with the purposes of

the Resolution as set forth in Section One. One purpose set forth in the Resolution is to "ensure that

persons seeking to exercise constitutional freedoms of expression can communicate effectively

with users of the Airport." (Res. No. 11-06, Section One, Purpose, ECF No. 29-1.) Other purposes

identified in the Resolution are to "ensure the free and orderly flow of pedestrian traffic through the

Airport's terminal premises and to reduce congestion," and to "preserve and safeguard desirable

aesthetic qualities and features of the Airport's terminal." (*Id.*)

 One of the Plaintiff's arguments is that the free speech zones are unreasonable because his

activities would not cause congestion or present security concerns any more than Hospitality Hosts

handing out cookies or travelers frequenting the bookstore would cause. An analogous argument

was rejected by the Seventh Circuit in *Jacobsen v. Illinois Department of Transportation*, 419 F.3d

642 (7th Cir. 2005). In *Jacobsen*, the plaintiff, a newsrack operator, challenged the authority of the

Illinois Department of Transportation (IDOT) to determine the location he could place his

newsrack within a rest area. *Id.* at 648. The plaintiff wanted to place his rack in high traffic areas,

such as beside building doors, and did not want to mingle his rack with all the others. He argued

that if garbage cans did not create a safety hazard when placed beside the doors, neither would his

newsracks. The court reasoned:

> The clear flaw in this reasoning is that if Jacobsen wants to place his racks beside
> the doors so that he can garner more sales, other vendors will want to be beside the
> doors as well. While a single garbage can might not be an encumbrance, a garbage
> can surrounded by newsracks could be. With no evidence that the racks of all the
> vendors are tucked away so that rest area users cannot find them, we cannot call this
> regulation unreasonable.

*Id.* Here, the designated speech areas inside and outside the terminal are not out of sight or difficult

to reach. They are adjacent to well-traveled areas. If the Plaintiff wants to hand out literature in a

higher traffic area with greater visibility and opportunity for contact with FWA customers, others

engaged in free speech activity may want to do the same. While a single Hospitality Host might not

create congestion, a Hospitality Host surrounded by even a single leafletter or protestor could. In

addition, because the restriction is both content and viewpoint neutral, it must also be recognized

that messages that cause more disruption than the Plaintiffs will be allowed in the Airport. FWA

"need not wait until havoc is wreaked to restrict access to a nonpublic forum," *Cornelius*, 473 U.S.

at 810, thus it is of little relevance that the Plaintiff's activity, by itself, may not interfere with

FWA's purpose.

18

Moreover, if the Plaintiff is accurate in his assessment that his particular speech (in combination with any other speech for which a permit has been obtained) will not interfere with the purposes served by FWA even if it is conducted outside the designated free speech areas, he is free to request through the permit application that the Director designate additional free speech areas. The Director would be authorized to accommodate the request provided that the proposed free speech activity would not interfere with the safe and orderly operation of the Airport and is consistent with the purposes of the Resolution. In contrast to the prohibition struck down in *Lee*, which involved "an absolute prohibition," this does not work a complete ban unrelated to any legitimate government purpose. 505 U.S. at 691 (O'Connor, J., concurring); *id.* at 692 (distinguishing the prohibition on leafletting from valid regulations on the time, place, and manner of leafletting, which the Port Authority was free to promulgate).

The Court finds that disagreement with the Airport Authority's rationale for selecting the free speech areas is not the same as establishing that it is an unreasonable place restriction, i.e., that it does not preserve the property for the uses to which it has been put. The Defendant could reasonably conclude that limiting free speech activity that is not otherwise incidental to air travel to certain areas within and outside the terminal is related to the protection of its interests in maintaining a secure environment, reducing congestion, ensuring the free and orderly flow of pedestrian traffic, and preserving desirable aesthetic qualities and features of the Airport.

**B.      Reasonableness of Permit Application Requirement**

The Plaintiff argues that the permit requirement is not "substantially related" to a "sufficiently important" governmental interest. However, this is the test that applies to restrictions

on speech in designated public forums, and the Court has already determined that the Airport is a nonpublic forum. "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. Alternatively, the Plaintiff argues that the permit requirement of Resolution No. 11-06 fails even this test. He asserts that the requirements of providing two days advance notice, identifying the speaker, and disclosing the subject matter are not reasonable given the nature of the forum and its purposes.

Resolution No. 11-06, Section 3(e), provides that a permit shall not be denied "based upon the identity of the person . . . [or] . . . based upon the topic or content of the proposed activity." The Plaintiff argues that this shows that there is no reason to require an applicant to state the subject matter of his activity.  He also argues that it is not reasonable to require that the speaker identify himself, especially "given the plethora of persons that are permitted to visit the Airport everyday—to rent cars, visit the restaurant, spend time in the arcade, or pick up passengers—who are not required to self-identify." (Pl.'s Mem. 25, ECF No. 39.)

The fact that the Director may not deny a permit based upon the subject matter of the expressive activity does not mean that there is no reasonable basis to request the information. The Airport has identified other administrative concerns. The Airport Authority maintains that the information requested in the permit application is collected to allow the Defendant to assess the size of the potential disruption to FWA activities and to allow the Defendant to make adequate preparations. The subject matter and intended audience of the proposed activity is requested to coordinate the activity and arrange for security in a manner that does not interfere with the day-to-day operations of the Airport. The Plaintiff asserts that he does not want to disclose the particular

20

subject matter of his activity because it challenges the Airport's procedures, but he does not point to any adverse consequence that he suffered as a result of identifying the subject matter of his speech.

The Plaintiff argues that his activity is no more disruptive than that of other users of the Airport, who are not required to obtain a permit. The other people the Plaintiff identifies are travelers and those accompanying departing travelers or greeting arriving passengers—people who spend limited time at the Airport. In contrast, persons distributing literature or engaging in expressive activity may remain in the Airport for numerous hours, day after day. It is not unreasonable for the Airport Authority to require a permit so that it can be advised who is regularly using the Airport, especially in light of security concerns present at airports and the designated evidence that persons who do not appear to have airport-related business draw the attention of staff. Also, depending on the subject matter, a person who is at the Airport to engage in expressive activity or literature distribution may cause substantially more disruption than a person who is not engaging in such activity and is merely using the Airport for its intended commercial purpose.

The Plaintiff cites to *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002), for the proposition that speakers have a right to speak anonymously and spontaneously. The *Watchtower* court considered the constitutionality of an ordinance barring door-to-door advocacy on private residential property without first obtaining a permit, 536 U.S. at 166–68 (holding that the permit requirement was too broad because it encompassed all forms of canvassing and was not tailored to the government's legitimate interests), and thus involves an entirely different context from the establishment of content-neutral time, place, and manner restrictions on the use of government-owned property. Tellingly, *Watchtower* does not contain any

forum analysis, revealing that it was decided under an entirely different rubric and is not controlling here. *Cf. Marcavage*, 659 F.3d at 633–34 (holding that an "extensive permitting scheme" was appropriate for Navy Pier as a nonpublic forum). Even in the context of a public forum, permit requirements have been regularly imposed and upheld on constitutional grounds. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002) (upholding Chicago's municipal park ordinance that required individuals to obtain a permit before conducting certain events in parks and other public property); *see also Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir. 2001) ("Permit requirements are routinely imposed on the use of public parks and other public spaces for expressive uses"). The Plaintiff has not cited to any case where the permit requirement for a nonpublic forum was found to be unreasonable.

Regarding the two-day advance notice requirement, the Plaintiff argues that it is unreasonable to necessitate a lone leafletter to apply for a permit in light of the other activity conducted at the Airport that does not require such advance notice, such as people welcoming home passengers with signs or frequenting the amenities offered by the Airport. The Airport Authority argues that its permit application procedure need not contain a small group exception. It contends that a situation could occur where a number of individuals or small groups desire to conduct free speech activity at the Airport at the same time, which would frustrate the purpose of the Airport. Indeed, the Resolution contemplates that the number of applicants desiring and permitted to use the free speech areas might exceed three for any one period of time, and that in such cases the Director will schedule each applicant's use of a free speech area so as to apportion equally the available time at an area. The Airport Authority's permit requirement allows the Director to assign space and prevent an over-concentration of activity in one place or at one time, thereby protecting the

22

Airport's primary function while still allowing for expressive activity.

The Court finds the requirements of the Airport's Resolution, including the permit process, to be reasonable in light of FWA's function and purposes.


## C.        Overbreadth Doctrine

The First Amendment overbreadth doctrine permits an individual whose own speech or conduct may be prohibited to challenge a statute on its face "because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985)). To be invalidated for overbreadth, a statute or regulation must proscribe a "substantial" amount of constitutionally protected activity. *Id.*; *New York v. Ferber*, 458 U.S. 747, 769 (1982). There must be a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Because the only remedy for overbreadth is to completely invalidate the regulation or statute, courts have a duty to avoid constitutional difficulties by applying an appropriate narrowing construction where possible. *Ferber*, 458 U.S. at 769 n.24; *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369 (1971); *see also Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003) ("[W]e have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth invalidation.") (citations omitted).

23

In support of its overbreadth argument, the Plaintiff relies heavily on *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc*. The Plaintiff argues that there are striking similarities between *Jews for Jesus* and this case. In *Jews for Jesus*, the Court was confronted with a resolution promulgated by the Board of Airport Commissioners for Los Angeles International Airport. The resolution provided in pertinent part: "the Central Terminal Area at Los Angeles International Airport is not open for First Amendment activities by any individual and/or entity." *Jews for Jesus*, 482 U.S. at 570–71. In short, the resolution banned all First Amendment activity, creating a "First Amendment Free Zone." *Id.* at 574. The Supreme Court held that the resolution was "substantially overbroad" and "not fairly subject to a limiting construction," *id.* at 577, noting that the resolution did "not merely regulate expressive activity . . . that might create problems such as congestion or the disruption of the activities of those who use [the airport]," but that it prohibited all First Amendment activity. *Id.* at 574. The Court stated, in addition, that it is "obvious that such a ban cannot be justified even if [the airport] were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech." *Id.* at 575.

The resolution at issue in *Jews for Jesus* is distinguishable from Resolution No. 11-06, which does not ban all First Amendment activity by any entity or individual, but instead imposes restrictions on expressive activity that are viewpoint neutral and reasonable in light of the purpose served by the Airport. The Plaintiff argues that the definitions of Expressive Activity and Literature Distribution in Resolution No. 11-06 are "every bit as broad as the restriction in *Jews for Jesus*." (Pl.'s Mem. of Law 13, ECF No. 39.) However, unlike Resolution No. 11-06, the resolution in *Jews for Jesus* contained no exception within its definition for communication that is "incidental to the use of the Airport's facilities" by persons "whose primary purpose for being present at the Airport is

24

a purpose other than exercising free speech rights." (Resolution No. 11-06, Section Two.

Definitions, subsection (d), ECF No. 29-1.) The Plaintiff argues that the exception is not sufficient,

and provides various examples of innocuous activity that would be restricted if undertaken by

persons who were visiting the Airport for the purpose of exercising free speech rights.

First, the Plaintiff argues that a person coming to the Airport to participate in expressive

activity in a free speech area could not wear a symbolic T-shirt because he would have to pass

through areas of the Airport where such activity was prohibited to get to the free speech area. Nor

could he, according to the Plaintiff, use the restroom or get a cup of coffee. Similarly, the Plaintiff

asserts that a company executive wishing to purchase advertising space at the Airport would be at

the Airport for the purpose of exercising free speech rights and would thus be prohibited from

wearing a campaign button to do so. The Court finds that the person intending to engage in free

speech activity could easily comply with the Resolution by removing or covering the T-shirt until he

was in a designated free speech area and thus be in compliance with the Airport's time, place, and

manner restrictions. Likewise, the executive could easily remove any campaign button. In doing so,

his First Amendment rights would not be significantly compromised.

The Plaintiff also asserts that a person coming "to the Airport to attend a public meeting of

the Authority, or comment on its proposals, could similarly not wear a symbolic t-shirt or engage in

innocuous conversation (or even attend the meeting, which itself is a 'free speech right[]'), nor

could that person even voice his or her opinion(s) at the public meeting for this, too, would

undoubtedly constitute 'Expressive Activity.'" (Mem. Law Supp. Mot. Summ. J. 15.) The Court

finds that, applying an appropriate narrowing construction, no person attending a meeting of the

Airport Authority to address issues that have been specifically opened to the public would suppose

25

that Resolution No. 11-06 applies to his or her speech and thus refrain from attending the meeting or speaking on agenda matters due to the Resolution. It is a strained construction of the Resolution that would require an attendee to obtain a permit to attend the meeting, which is, presumably, not held in one of the designated free speech areas. The stated purpose of the Resolution is to ensure that the "security, operational efficiency and aesthetics of the Airport's terminal will not be impaired." (Resolution No. 11-06, Preamble, ECF No. 29-1.) This flows from the purpose of the Airport as a commercial enterprise providing air travel to the traveling public. The purpose of the meeting, to facilitate the official business of the Airport Authority, is quite different and is outside the scope of the Resolution. The threat to free speech presented by the Plaintiff's hypothetical is not real and substantial.

Another hypothetical that the Plaintiff presents to demonstrate the Resolution's overbreadth is that a person could not wear an expressive T-shirt or a campaign button while partaking in the video-game arcade, or even use the arcade at all, because the Supreme Court has recently clarified that the games themselves constitute a free speech right. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011) (invalidating a California state ban on the sale of violent video games to minors). One of the problems with this hypothetical is that there is no evidence to suggest that any members of the public visit the Airport for the purpose of playing the video games offered there, thus eliminating the criteria that their primary purpose for being at the Airport is to exercise their free speech rights. Accordingly, any messages they convey, either by wearing T-shirts or otherwise, are incidental to the use of the Airport's facilities and fall within the Resolution's exception. On the rare occasion that a person decided to go to the Airport simply to play games in the arcade, the Resolution's application to his or her T-shirt would not be substantial, either in the absolute sense or

26

relative to the scope of the Resolution's legitimate applications.[2]

As another example of overbreadth, the Plaintiff asserts that a person traveling to the Airport to welcome home a returning family-member or service-person, and perhaps carrying a sign to do so, would be violating the Resolution. The Court finds that such a person would fall within the exception as their primary purpose would not be to engage in expressive speech, but to welcome home a traveler without whom they would not be at the Airport. It is a reasonable interpretation of the Resolution to include welcoming passengers as activity that is incidental to the use of the Airport's facilities as it is a daily event that is part and parcel of air travel.

Finally, the Plaintiff argues that the Airport's Hospitality Host program violates the Resolution because greeting arriving passengers with a cookie is a free speech activity. It is a strained construction of Resolution No. 11-06 to suggest that it would constrain the Hospitality Hosts from the Airport's own Welcome Center from fulfilling their purpose. Even as volunteers, there is no reasons to believe that the Hosts are any less a fixture at FWA than paid staff.

The exception for speech that is incidental to the use of the Airport's facilities makes Resolution No. 11-06 significantly different than the prohibition in *Jews for Jesus*, which banned all First Amendment activity. The Court does not find any realistic danger that the Resolution will significantly compromise recognized First Amendment protections of parties not before the Court.

---

[2] The Court notes that it is the video games themselves, not the players of those games, that communicate ideas and are considered protected speech. 131 S. Ct. 2733 ("Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)."). The Airport has not purported to regulate the content of the games.

27

**CONCLUSION**

For the reasons stated above, the Court GRANTS the Defendant's Motion for Summary Judgment [ECF No. 46] and DENIES the Plaintiff's Motion for Summary Judgment [ECF No. 38]. The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on December 5, 2011.

                 s/ Theresa L. Springmann
                THERESA L. SPRINGMANN
                UNITED STATES DISTRICT COURT